UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

*ELECTRONICALLY FILED*

| | |
|---|---|
| PRIME FINISH, LLC, )<br>)<br>Plaintiff, )<br>)<br>and )<br>)<br>CAMEO, LLC, )<br>)<br>Intervenor Plaintiff, )<br>)<br>v. )<br>)<br>ITW DELTAR IPAC, )<br>)<br>Defendant. ) | No. 5:08-CV-438-GFVT-REW |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CALCULATION OF LIQUIDATED DAMAGES

Cameo, LLC ("Cameo") has sued ITW Deltar IPAC ("ITW") for damages based on ITW's early termination of a May 26, 2005 Product Supply Agreement ("Supply Agreement") between ITW and Prime Finish, LLC ("Prime"). Pursuant to that contract, Prime agreed to paint and decorate interior automotive parts provided by ITW. The agreement had a four-year term that began after the "start of production" under the contract. If ITW terminated the Supply Agreement early for any reason—except for Prime's violation of certain quality or delivery standards ("Quality Standards")—ITW was obligated to pay early termination liquidated damages. The amount of damages varied depending on when the agreement was terminated. As is relevant here, if ITW terminated the contract in month 37, the liquidated damages were $125,000.

The Supply Agreement is unambiguous, and as a matter of law, the "start of production" that triggered the agreement's four-year term was the beginning of any work under the contract.

It is undisputed that Prime started this work in July 2005, and that, 37 months later, on August 1, 2008, ITW terminated the agreement early. In these circumstances, the plain and ordinary meaning of the Supply Agreement demonstrates that the "start of production" was July 2005 and any early termination liquidated damages are limited to $125,000. Because contract interpretation is a matter of law, the Court should grant summary judgment for ITW on this ground.

## STATEMENT OF UNDISPUTED FACTS

### A. Prime and Cameo Enter into a Production Service Agreement

On May 25, 2005, Cameo and Prime entered into a Production Service Agreement. (Production Service Agreement, May 25, 2005, attached as Exhibit 1.) Pursuant to the agreement, Cameo agreed to fund a paint line at Prime's business. In return, Prime agreed to pay Cameo royalties for the parts painted. (*Id.* at 1.)

### B. Prime and ITW Enter into the Supply Agreement

On May 26, 2005, ITW and Prime entered into the Supply Agreement, pursuant to which Prime agreed to paint and decorate interior automotive parts provided by ITW. (Supply Agreement, May 26, 2005, attached as Exhibit 2.) Under the contract, Prime's work would encompass four separate vehicle programs: (1) the "Camry 044L" program; (2) the "Tundra & Sequoia 180L" program; (3) the "Nissan L42A" program; and (4) the "Honda Pilot" program. (*Id.* at 1.) Prime had "current capacity to partially meet" ITW's requirements for painting and decorative work under these programs, but would add an additional paint line to increase its overall capacity in order to "fully meet [ITW's] requirements." (*Id.*) This additional paint line was funded by Cameo. (Ex. 1, at 1.)

The Supply Agreement's term was defined as follows: "This Agreement shall be for a term of four (4) years . . . and shall continue for forty-eight months (48) <u>following the start of</u>

2

production . . . ." (Ex. 2, at 1 (emphasis added).) The Supply Agreement also provided that, if ITW terminated the contract early for any reason—except for Prime's failure to meet the Quality Standards under Section 3.4—ITW was obligated to pay early termination liquidated damages, pursuant to a sliding scale. (*Id.* at 3.) The early termination liquidated damages gradually decreased over the life of the Supply Agreement. For instance, the liquidated damages were $1,000,000 if ITW terminated in the first six months, $500,000 if ITW terminated during months 19-24, $375,000 if ITW terminated during months 25-30, and $125,000 if ITW terminated during months 37-42. (*Id.*)

"Cameo drafted . . . the terms and conditions set forth in" the Supply Agreement between Prime and ITW. (Ex. 1, at 2.)

  C.  **Prime Performs Work on the Honda Pilot and Camry 044L Programs**

Prime began painting automotive parts for ITW under the Honda Pilot program in July 2005. (Pl.'s Discovery Resps., Aug. 1, 2016, attached as Exhibit 3, at 1 ("Cameo admits that the painting of Honda parts by Prime Finish began no later than July 2005."); Email, Jan. 2, 2008, attached as Exhibit 4 (stating that ITW "received our first production shipment of Honda Pilot parts from Prime Finish" on July 26, 2005).)

In January 2006, Prime began painting parts for ITW under the Camry 044L program. (Ex. 3, at 2 ("Cameo admits that the painting of Toyota Camry parts for ITW by Prime Finish began no later than January 2006.").)

  D.  **ITW Terminates the Supply Agreement**

On August 1, 2008, citing Prime's insolvency and failure to comply with the Quality Standards, ITW terminated the Supply Agreement. (Notice of Termination of Product Supply Agreement, Aug. 1, 2008, attached as Exhibit 5.)

3

### E. This Lawsuit

On September 20, 2008, Prime brought suit against ITW alleging, among other things, breach of the Supply Agreement. On February 23, 2009, Cameo filed an Intervening Complaint against Prime and ITW, seeking only early termination liquidated damages in the amount of $375,000.

On May 26, 2010, Prime and ITW entered into a mutual settlement and release agreement, pursuant to which both parties released any and all claims related to the instant litigation. (Mutual Settlement and Release, May 26, 2010, attached as Exhibit 6.) In exchange, ITW paid Prime $50,000. (*Id.* at 1.) The Court dismissed Prime's Complaint against ITW a few days later.

On April 28, 2016, eight years after first filing suit, Cameo filed a First Amended Complaint, seeking other damages for breach of contract in addition to liquidated damages. Cameo filed a Second Amended Complaint on June 8, 2016, increasing its liquidated damages request from $375,000 to $500,000. Cameo justifies this damage demand based on the theory that the "start of production" under the Supply Agreement was September 2006, such that ITW's termination of that agreement on August 1, 2008 occurred less than twenty-four months into the agreement's four-year term, thereby triggering the $500,000 early termination liquidated damages. (Ex. 3, at 6 ("[T]he start of production for purposes of the Product Supply Agreement [occurred when parts] . . . for the Nissan L42A program [were] painted during September 2006."); *see also id.* at 9 ("ITW breached the Product Supply Agreement on August 1st, 2008, less than 24 months after the . . . Prime Finish paint-line had commenced production parts for ITW programs.").) Cameo selects September 2006 as the operative date because it contends the "start of production" under the Supply Agreement only includes work that Prime performed on ITW's automotive parts using the new paint line that Cameo installed at Prime's headquarters.

4

(*Id.* at 1-2 (denying that Prime's painting of parts under the Honda Pilot and Camry programs, in July 2005 and January 2006, respectively, "was pursuant to the Product Supply Agreement," because neither was painted on the paint line that Cameo installed); *see also id.* at 2-3 (objecting to request for admission to the extent it is "intended to define the start of production" as July 2005).)

## LEGAL STANDARD

Summary judgment is appropriately granted where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "It is well settled that the interpretation of contracts is an issue of law for the court to decide." *Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky. 2006). Thus, it is appropriate for the court to determine issues of contract interpretation on summary judgment. *Id*. at 557 ("The [trial court's grant of] partial summary judgment was appropriate because the interpretation of the contract was a matter of law."); *Grass v. Akins*, 368 S.W.3d 150, 153 (Ky. Ct. App. 2012) (in affirming grant of summary judgment, noting that "the construction and interpretation of contracts are questions of law to be decided by the trial court").

## ARGUMENT

**I.   THE "START OF PRODUCTION" MEANS, AS A MATTER OF LAW, THE BEGINNING OF PRIME'S WORK UNDER THE SUPPLY AGREEMENT**

The Supply Agreement's four-year term runs from the "start of production." The question presented here is whether that term refers to the start of any production, or whether the term means, as Cameo argues, the start of production only on the new paint line. Under well-established principles of contract interpretation, the Court should hold that the term "start of production" means what it says, and refers to the start of any work under the Supply Agreement.

5

### A. The Supply Agreement Means What It Says

The Supply Agreement—a contract drafted by Cameo, and negotiated by sophisticated business entities through an arm's length negotiation process—means what it unambiguously says.

First, it is well-established that Kentucky courts "interpret the terms of [a] contract according to their plain and ordinary meaning." *Larkins v. Miller*, 239 S.W.3d 112, 115 (Ky. Ct. App. 2007); *see also K.M.R. v. Foremost Ins. Grp.*, 171 S.W.3d 751, 753 (Ky. Ct. App. 2005) (same); *Journey Acquisition–II, L.P. v. EQT Prod. Co.*, 830 F.3d 444, 452 (6th Cir. 2016) (same). In the context of a contract under which Prime agreed to paint and decorate automotive parts provided by ITW, the plain and ordinary meaning of the unambiguous phrase "the start of production" is the beginning of Prime's work for ITW under the agreement. This interpretation comports with the dictionary definitions of the applicable terms. "Start" is defined, in relevant part, as "to begin an activity or undertaking;" "production," in turn, is "the act or process of producing." Webster's Third New International Dictionary (2002). It also reflects the parties' chosen language in the Supply Agreement, as no term precedes or limits the word "production," demonstrating that <u>any</u> work by Prime would commence the agreement's four-year term. Further, because there was no predecessor contract between Prime and ITW for painting and decorating automotive parts, any work that Prime performed was, necessarily and logically, work under the Supply Agreement constituting the "start of production."

Second, ITW's interpretation of the Supply Agreement is consistent with a holistic reading of the contract. The agreement states that Prime had "<u>current capacity to partially meet the requirements of [ITW]</u>." (Ex. 2, at 1. (emphasis added).) It further provides that, "in order to <u>fully supply [ITW's] requirements</u>, [Prime] will be required to add an additional paint line to its current facility." (*Id.* (emphasis added).) In other words, the Supply Agreement expressly

6

contemplated that Prime would use its existing facilities to partially service ITW's needs under the contract, but would add a new paint line to "fully" meet those requirements. Accordingly, interpreting "the start of production" to include any production done by Prime, whether on the new paint line or not, reads the agreement's provisions as a whole. *See Journey Acquisition-II, L.P. v. EQT Prod. Co.*, 39 F. Supp. 3d 877, 887 (E.D. Ky. 2014) ("[T]he Court must read the various provisions of the contract as a whole."); *L.K. Comstock & Co. v. Becon Const. Co.*, 932 F. Supp. 948, 964 (E.D. Ky. 1994) (stating that courts are "obligated to read the parts of the contract as a whole"), *aff'd*, 73 F.3d 362 (6th Cir. 1995).

Third, ITW's interpretation gives effect to all provisions of the contract, because it construes the Supply Agreement's scope of work provision concomitantly with its four-year term. *See Clair v. Hillenmeyer*, 232 S.W.3d 544, 549 n.11 (Ky. Ct. App. 2007) ("The general rule of interpretation of contracts is that effect must be given to all terms of the contract."); *Journey Acquisition-II, L.P.*, 39 F. Supp. 3d at 887 ("[A]n interpretation of the contract that gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." (citation omitted)). Here, the Supply Agreement states that Prime's work would encompass four vehicle programs, including the Honda Pilot and Camry 044L programs. (Ex. 2, at 1.) It is undisputed that Prime performed work on these programs beginning in July 2005 and January 2006, respectively, using its existing painting facilities. (*See* Section C, *supra*.) Interpreting the "start of production" as including this work therefore gives effect to the parties' inclusion of these vehicle programs in the Supply Agreement. It also logically construes the beginning of Prime's work under the contract as commencing the contract's four-year period.

In sum, ITW's interpretation of the Supply Agreement is based on the plain and ordinary meaning of the phrase the "start of production," it is consistent with a holistic reading of the contract, and it comports with fundamental principles of Kentucky law on contract interpretation.

> **B.   Cameo's Interpretation of the Supply Agreement Is Incorrect and Inconsistent with Kentucky Law**

Cameo's strained construction of the Supply Agreement fails as a matter of law and common sense. First, it is unsound. Followed to its logical conclusion, it means that work indisputably performed by Prime on the Honda Pilot and Camry 044L programs—programs specifically listed in the Supply Agreement—<u>was work</u> performed under the contract, but simultaneously <u>not work</u> that triggered the contract's four-year term. Nothing in the agreement shows that the parties intended such a fundamental disconnect between the contract's scope of work provision and contract period. And this Court should not interpret the Supply Agreement in a manner that defies common sense and creates an absurd result. *See, e.g., Francis v. Armstrong Coal Reserves, Inc.*, No. 4:11-CV-00077-M, 2012 WL 5949466, at *7 (W.D. Ky. Nov. 28, 2012) ("Contracts must be construed consistent with common sense and in a manner that avoids absurd results."). Reading the "start of production" as excluding Prime's work on the Honda Pilot and Camry 044L programs also does violence to the Supply Agreement by essentially reading these freely negotiated provisions out of the contract. It therefore violates the basic tenet of Kentucky contract interpretation that contracts should be read as a whole, giving effect and meaning to each provision. *See Clair*, 232 S.W.3d at 549 n.11; *Journey Acquisition-II, L.P.*, 39 F. Supp. 3d at 887.

Second, by construing the "start of production" to mean the "start of production <u>only on the new paint line installed by Prime</u>," Cameo asks this Court to read additional terms into an otherwise unambiguous contract provision. This, it cannot do. "The courts do not write contracts for the parties nor do they read into an unambiguous contract words or provisions it does not

8

contain." *Florida Canada Corp. v. Union Carbide & Carbon Corp.*, 280 F.2d 193, 196 (6th Cir. 1960); *see also Snowden v. City of Wilmore*, 412 S.W.3d 195, 208 (Ky. Ct. App. 2013) (stating that when the parties' intentions are "clearly stated in a written document, we have no authority to add terms not included by the parties"); *Smith v. Crimson Ridge Dev., LLC*, 410 S.W.3d 619, 621 n.2 (Ky. Ct. App. 2013) ("[C]ourts will not remake a contract for the parties."). In other words, Cameo's interpretation asks this Court to "read[] into the contract a provision that the parties did not put there" while simultaneously "ignor[ing] a provision that they did put there." *Hardaway Const. Co. v. United States*, 852 F.2d 174, 179 (6th Cir. 1988) (refusing to adopt this interpretation of the contract).

Third, if Cameo, as the drafter of the Supply Agreement, had wanted the "start of production" to actually mean something quite different, it plainly could have written the contract accordingly. *See, e.g., Papa John's Int'l, Inc. v. Dynamic Pizza, Inc.*, 317 F. Supp. 2d 740, 750 (W.D. Ky. 2004) ("These franchise agreements were negotiated by two sophisticated business entities. . . . If one party wanted to add or subtract a term of the contract, . . . it could have done so in contract negotiations."). It did not do so. Cameo's failure to implement a provision reflecting its currently asserted and self-serving interpretation is therefore strong evidence that the Supply Agreement does not embody this meaning. *See, e.g.*, *Journey Acquisition-II, L.P.*, 39 F. Supp. 3d at 896 (noting that the drafting party "could have made its" interpretation of the contract "clear from the plain language of the contract, and since it was the party in the best position to do so, it should not be able to complain when the contract language is construed against it"). Indeed, even if Cameo had intended this result—or, more realistically, now prefers, with the benefit of hindsight, that it had intended this result—that is insufficient for this Court to interpret the Supply Agreement in contravention of its clear and unambiguous terms. *See Gibson Co. Real Estate v. Garrett, LLC*, No. 2011-CA-000065-MR, 2013 WL 4710325, at *5 (Ky. Ct.

App. Aug. 30, 2013) (rejecting a party's interpretation of an unambiguous contract because the "fact that one party may have intended different results . . . is insufficient to construe a contract at variance with its plain and unambiguous terms"); *Buckley v. Morgan*, No. 2007-CA-001313-MR, 2008 WL 4683029, at *2 (Ky. Ct. App. Oct. 24, 2008) ("Even if one of the contracting parties may have intended a different result, a contract cannot be interpreted in discordance with the plain meaning of the terms of the contract.").

Fourth, assuming, *arguendo*, that the "start of production" provision is ambiguous—which it is not—it is well-established that any ambiguities must be construed against Cameo, the drafter of the Supply Agreement. "No rule is better established than that, when a contract is susceptible of two meanings, it will be construed strongest against the party who drafted and prepared it." *Theatre Realty Co. v. P.H. Meyer Co.*, 48 S.W.2d 1, 2 (Ky. 1932) (citation omitted); *Lynch v. Claims Mgmt. Corp.*, 306 S.W.3d 93, 98 (Ky. Ct. App. 2010) (same); *L.K. Comstock & Co.*, 932 F. Supp. at 968 (same). All of the foregoing reasons would apply with equal force to demonstrate that, even if the agreement is ambiguous, Cameo's interpretation is wrong as a matter of law.

It is not the Court's job to rewrite the Supply Agreement contrary to its plain and ordinary meaning, simply because Cameo now wishes that it wrote the contract a different way. *Duane Mgmt. Co. v. Prudential Ins. Co.*, 29 F.3d 245, 249 (6th Cir. 1994) (applying Kentucky law, and stating "[the plaintiff] seeks to have us interpret a different contract than the one the parties entered and to increase its entitlement on termination. To give such an interpretation to the contract would be to rewrite it, and this we decline to do."). The agreement provides that any work by Prime—whether or not that work occurred using the new paint line—constituted the "start of production." "[C]onstruction of a contract is a matter of law," and therefore, summary

10

judgment on this issue is proper. *FS Investments, Inc. v. Asset Guar. Ins. Co.*, 196 F. Supp. 2d 491, 498 (E.D. Ky. 2002).

## II. IN THE EVENT ITW TERMINATED THE SUPPLY AGREEMENT FOR A NON-QUALITY STANDARDS REASON, ANY EARLY TERMINATION LIQUIDATED DAMAGES ARE LIMITED TO $125,000

Because the "start of production" means, as a matter of law, the beginning of Prime's work under the Supply Agreement, any early termination liquidated damages are limited to $125,000. The agreement provides that, if ITW terminated the contract early for any reason except Prime's violation of the Quality Standards, ITW is obligated to pay early termination liquidated damages. (Ex. 2, at 3.) The early termination liquidated damages are $125,000 if ITW terminated the agreement in the 37th month. (*Id.*)

Here, it is undisputed that Prime began working on the Honda Pilot program in July 2005. (*See* Section C, *supra*.) It is similarly undisputed that, 37 months later, ITW terminated the Supply Agreement early, on August 1, 2008. (*Id.*) Accordingly, as a matter of law, if ITW terminated the agreement for any non-Quality Standards reason, the early termination liquidated damages are limited to $125,000. *See Apex Contracting, Inc. v. City of Paris*, No. 2002-CA-001310-MR, 2004 WL 758276, at *2 (Ky. Ct. App. Apr. 9, 2004) ("Summary judgment is appropriate when a party's claim for damages is barred by a contractual provision."); *Options Home Health of N. Florida, Inc. v. Nurses Registry & Home Health Corp.*, 946 F. Supp. 2d 664, 674 (E.D. Ky. 2013) ("Where, as here, there is no material fact in dispute, this Court may determine the parties' intention, and interpret the contract, as a matter of law.").

For all of the foregoing reasons, the Court should hold as a matter of law that any early termination liquidated damages are limited to $125,000.

## **CONCLUSION**

ITW respectfully requests that the Court grant this motion and conclude that Cameo cannot, as a matter of law, obtain any early termination liquidated damages in excess of $125,000.

Dated:  December 13, 2016                             Respectfully submitted,


                                                                                 *s/ Carolyn J. Fairless*
                                                                                 Carolyn J. Fairless (*admitted pro hac vice*)
                                                                                 Christopher E. McCall (*admitted pro hac vice*)
                                                                                 WHEELER TRIGG O'DONNELL LLP
                                                                                 370 Seventeenth Street, Suite 4500
                                                                                 Denver, Colorado  80202
                                                                                 Telephone:  303.244.1800
                                                                                 Facsimile:  303.244.1879
                                                                                 Email:     fairless@wtotrial.com
                                                                                                mccall@wtotrial.com

                                                                                 and

                                                                                 Lee A. Rosenthal
                                                                                 CASEY, BAILEY & MAINES, PLLC
                                                                                 3151 Beaumont Centre Circle
                                                                                 Suite 200
                                                                                 Lexington, KY 40513
                                                                                 Telephone:  859.243.0228
                                                                                 Facsimile: 859.317.8070
                                                                                 lrosenthal@cbmlaw.net

                                                                                 Attorneys for Defendant ITW Deltar IPAC

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2016, the foregoing was filed electronically with the Clerk of the United States District Court of the Eastern District of Kentucky via the CM/ECF system, which will send Notice of Electronic filing to:

Albert F. Grasch, Jr.
Rose Grasch Camenisch Mains PLLC
326 S. Broadway
Lexington , KY 40508
Telephone: 859-721-2100
Facsimile: 859-523-3857
Email: Al.Grasch@rgcmlaw.com
          Patty.doyle@rgcmlaw.com

Brian Michael Gudalis
Ward, Hocker & Thornton
333 W. Vine Street Suite 1100
Lexington , KY 40507
Telephone: 859-422-6000
Facsimile: 859-422-6001
Email: Brian.Gudalis@whtlaw.com
          delay@whtlaw.com

*Attorneys for Plaintiff Prime Finish, LLC*

Thomas W. Miller
Elizabeth C. Woodford
MILLER, GRIFFIN & MARKS, P.S.C.
271 W. Short Street, Suite 600
Lexington, Kentucky 40507
Telephone: (859) 255-6676
Facsimile: (859) 259-1562
Email: twm@kentuckylaw.com
          ewoodford@kentuckylaw.com
          lmayo@kentuckylaw.com

Caitlin Ashlee Wohlander
Wohlander Law Office
P.O. Box 910483
Lexington , KY 40591
Telephone: 859-361-9244
Facsimile: 859-309-1698
Email:Wohlanderlaw.Caitlin@gmail.com

Danielle Brown
The Getty Law Group, PLLC
250 West Main Street
1900 Lexington Financial Center
Lexington , KY 40507
Telephone: 859-259-1900
Facsimile: 859-259-1909
Email: Dbrown@gettylawgroup.com
          Danielle@wohlanderlaw.com

E. Patrick Moores
1031 Wellington Way Suite 145
P.O. Box 910765
Lexington , KY 40591-0765
Telephone: 859-219-2477
Facsimile: 859-219-0077
Email: Patrick@epmooresattorney.com

*Attorneys for Intervening Plaintiff Cameo, LLC*

*s/ Carolyn J. Fairless by Colleen Egan*