UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| PRIME FINISH, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 5:08-cv-0438-GFVT |
| and | ) | |
| | ) | |
| CAMEO, LLC, | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| Intervenor Plaintiff, | ) | **ORDER** |
| | ) | |
| V. | ) | |
| | ) | |
| ITW DELTAR IPAC, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

The instant action was brought before federal court in 2008 after Defendant ITW Deltar IPAC removed the claims of Plaintiff Prime Finish, LLC, from Bourbon Circuit Court. The dispute arises out of a relatively uncomplicated "Product Supply Agreement" from May 26, 2005, whereby Prime Finish promised to paint interior automotive parts for ITW Deltar and ITW Deltar agreed to provide car parts to be painted throughout a forty-eight month term. Prime Finish specializes in painting and finishing plastic parts and ITW supplies car manufacturers with these finished parts. Prime Finish underwent significant expansion to fulfill the volume of painting required by ITW. Installation of this new and rather expensive paint line was only possible due to a sizable capital investment by Cameo, LLC. Prime Finish then began painting car parts for ITW Deltar and paying a royalty to Cameo for parts painted on the Cameo line but, as in all contract disputes, something went wrong.

Eventually, ITW terminated the "Product Supply Agreement" before the forty-eight month term had expired after complaining of Prime's alleged insolvency and quality standard issues with the painted materials. Prime then sued ITW for breach of contract and damages including the early termination penalty that had been agreed to in the Product Supply Agreement. Cameo intervened, arguing that any early termination penalty or other award paid to Prime was actually owed to Cameo. Roughly during this same time, Prime and ITW entered into a mutual settlement and release agreement and Judge Coffman granted summary judgment for ITW against Cameo holding that Cameo lacked standing to sue. In the first of two appeals, the Sixth Circuit reversed the district court's ruling and found that Cameo did have standing to sue as an intended creditor beneficiary of the supply agreement.

Following the Sixth Circuit's ruling, counsel for Cameo withdrew. Cameo then missed Court deadlines, was ordered to show cause for why the action should not be dismissed, and upon an unsatisfactory response the action was dismissed with prejudice by Judge Coffman. Following Judge Coffman's retirement, the case was reassigned to Judge Van Tatenhove who, upon a motion for reconsideration, denied the motion and upheld the dismissal. Following a subsequent appeal, reversal, and remand by the Sixth Circuit, Cameo filed amended intervening complaints. Now, on the eve of trial and nearly twelve years since the product supply agreement was signed, ITW Deltar has filed a Motion for Partial Summary Judgment on Cameo's Claim for Actual Damages in Addition to Liquidated Damages [R. 129] and a Motion for Partial Summary Judgment on Calculation of Liquidated Damages [R. 130]. After thoroughly reviewing the Product Supply Agreement, attached affidavits, the record, and relevant case law, the Court orders as follows: Defendant ITW Deltar IPAC's Motion for Partial Summary Judgment

[**R. 129**] is **DENIED** and the Defendant's Motion for Partial Summary Judgment [**R. 130**] is **GRANTED in PART and DENIED in PART.**

**I**

There are many uncontested facts in this case. The Sixth Circuit has already determined that Cameo has standing to sue as an "intended creditor beneficiary of the supply agreement." [R. 59 at 7.] But, the Court of Appeals refused to analyze what relief, if any, Cameo is entitled to based upon the Supply Agreement. [*Id.* at 13.] Initially, Cameo and Prime entered into a "Production Service Agreement" in which Cameo agreed to fund a new paint line for Prime and Prime agreed to pay a 7% royalty to Cameo for all parts that were painted on the Cameo line. [R. 129-2 at 2-3.] The agreement further instructed that "[a]ll ITW projects will be, by default, quoted to run on the new line…" [R. 129-2 at 2.] On May 26, 2005, the very next day, Prime and ITW entered into a "Product Supply Agreement" that had a four year term that "shall commence on June 1st 2005, and shall continue for forty-eight months (48) following the start of production (expected to be January 1, 2006)." [R. 129-4 at 2.]

The Product Supply Agreement establishes the parameters of the business relationship between Prime and ITW. In the agreement, Prime notifies ITW that "Seller will be required to add an additional paint line to its current facility" and that "Buyer [ITW] desires that Seller increase its capacity in order to fully meet Buyer's requirements and is willing to enter into this output agreement in order for Seller to commit to the installation of an additional paint line…" [R. 129-4 at 2.] The contract did not set exact numbers regarding the number of parts to be painted, but "Exhibit A" to the contract provides an "Estimated Minimum Annual Revenue" that

sets revenue for 2006 at $1.186m and the following three years of the four year agreement to yield $2.885m in minimum annual revenue. [R. 129-4 at 4.]

The day that production began is contested, but both parties agree that ITW terminated the supply agreement on August 1, 2008. [R. 129-5.] On August 1, 2008, Doug Marciniak, the Vice President and General Manager of ITW Deltar Body & Interior, sent a letter to Prime where he "terminate[d] the Agreement under Sections 3.3 and 3.4 of the Product Supply Agreement." Mr. Marciniak believed that "[u]nder Section 3.3, an event of default has occurred because Prime Finish is insolvent. An event of default has also occurred under Section 3.4 because Prime Finish repeatedly and continually failed to meet the Quality Standard defined by the Boundary Limits, despite ITW's written notice more than four months ago and ITW's exhaustive and costly efforts to help Prime Finish remedy such problems." [*Id.*] While the parties agree this termination letter was sent by ITW to Prime Finish, Cameo argues that the termination was not justified. [*See* R. 133 at 4-5.]

In the Product Supply Agreement "Section 3: Termination" allows for early termination of the forty-eight month contract term upon a number of different events of default. [R. 129-4.] While the contract allows for early termination in certain circumstances, "Exhibit B" to the contract provides for a "Penalty for Early Termination of Contract" which states, "[i]f ITW Deltar terminates its contract early, for any reason other than outlined in the exception below, ITW Deltar will pay the following termination penalty." [*Id.* at 4.] The sliding scale in Exhibit B provides for decreasing penalties over each consecutive six-month period in the following manner:

| Month range where contract is terminated | 0-6 | 7-12 | 13-18 | 19-24 | 25-30 | 31-36 | 37-42 |
|---|---|---|---|---|---|---|---|
| Damages in Millions ($USD) | $1m | $0.75 | $0.625 | $0.5 | $0.375 | $0.25 | $0.125 |

[R. 129-4 at 4.]

This lawsuit began in 2008 when Prime brought suit against ITW for breach of the Product Supply Agreement. Cameo's initial intervening complaint was filed in 2009 and sought a "Penalty Payment" of $375,000 for early termination of the contract from ITW Deltar. [R. 12-2 at 3.] In May, 2010, Prime and ITW entered into a "Mutual Settlement and Release" agreement where ITW paid Prime $50,000 and Prime released all claims related to this case. [R. 129-6.] Cameo also entered into a "Settlement Agreement, Release and Covenant Not to Sue" with Prime Finish but "[t]his Release recognizes that Cameo continues with its lawsuit against ITW pursuant to Cameo's claim of a right to recover any early termination penalty sum from ITW under the terms of the Prime Finish – ITW Product Supply Agreement and its Exhibit B, which was and is hereby assigned to Cameo." [R. 133-2 at 3.] The Court then dismissed all claims against ITW, but as discussed above, the Sixth Circuit reversed and remanded after determining that Cameo had standing to sue. [*See* R. 59.]

In April, 2016, Cameo filed a "First Amended Intervening Complaint" that sought damages due to ITW's breach of the Prime Finish and ITW agreements. [R. 95] Cameo maintained that it was "entitled to recover the 'penalty' pursuant to those agreements as liquidated damages for ITW's breach of those agreements." [R. 95 at 2.] But, Cameo also states that the Settlement Agreement between Cameo and Prime Finish [R. 133-2] provided an "independent basis to recover the early termination penalty, separate and apart from its status as an intended beneficiary of the ITW/Prime Finish agreements…" [R. 95 at 2.] In addition to the

early termination penalty, Cameo alleges damages from ITW's breach that include "lost profits, and expenditures incurred by Cameo in installing a paint line and equipment in Prime Finish's factory for use on ITW's products." [R. 95 at 1-2.] The Court allowed for Cameo to file a "Second Amended Intervening Complaint by Cameo, LLC" which modified the demand by seeking recovery of a $500,000 early termination penalty instead of the originally requested $375,000. [R. 102-2.]

In ITW's Motion for Partial Summary Judgment, the Defendant attached Cameo's discovery responses which specifically enumerate the damages sought by Plaintiff. Those damages include: (1) $500,000, plus interest for the early termination penalty, (2) $846,193, plus interest for lost royalties of 7% on the invoice price of painted parts as a result of the early termination, (3) $381,604, plus interest, for lost sales commission of 3% on the invoiced parts, and (4) $1,079,772, plus interest, as ITW's alleged breach led to default on a loan that was secured by the paint-line asset and that default resulted in legal possession of the paint line being taken by Cameo's creditor resulting in loss of use of the asset. [R. 129-1 at 4, R. 129-7 at 10.]

## II

### A

When sitting in diversity, a federal court applies the substantive law of the state in which it sits. *Hayes v. Equitable Energy Resources Co.*, 266 F.3d 560, 566 (6th Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). However, when considering summary judgment arguments, a federal court applies the standards of Federal Rule of Civil Procedure 56 rather than Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr. Inc.*, 807 S.W.2d 476 (Ky. 1991). *See Gafford v. Gen. Elec. Co.*, 997 F.2d

150, 165 (6th Cir. 1993). Under Rule 56, summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. A fact's materiality is determined by the substantive law, and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Summary judgment is inappropriate where there is a genuine conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Morales v. American Honda Motor Co., Inc.*, 71 F.3d 531, 535 (6th Cir. 1995) (quoting *Liberty Lobby*, 477 U.S. at 255). The Court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

## B

Defendant ITW seeks partial summary judgment, in two separate motions, on what are essentially the nature and size of Plaintiff's demand for damages. First, ITW contends that upon early termination of the Supply Agreement, the sole remedy available to Defendant are the

liquidated early termination damages as delineated in Exhibit B to the Product Supply Agreement signed by Prime Finish and ITW. [*See* R. 129-1 at 2.] ITW makes clear that "why" the Supply Agreement was terminated early is a disputed factual matter but that the issue of "what kind of damages Cameo may recover is a pure issue of law." [*Id.*] Cameo argues that the Early Termination Penalty "is not a true liquidated damages provision, so the case law holding that a liquidated damages provision constitutes a party's sole remedy for breach of contract does not apply." [R. 133 at 7.] Instead, Cameo argues that Kentucky law requires true liquidated damages provisions to be triggered following a party's breach. Plaintiff believes that since the early termination penalty can be awarded without the Defendant's breach, the penalty cannot be a liquidated damages provision. [*Id.* at 8-9.] Cameo further argues that the contract is ambiguous as to whether the parties intended the early termination penalty to "constitute a limit on damages in the event of breach." [R. 133 at 14.]

ITW also contends that the "start of production" date that establishes the commencement of the forty-eight month term of the agreement, as well as calculations for the penalty assessed under Exhibit B, should be measured by the start of "any work under the contract" and that this work began in July 2005. [R. 130-1 at 1-2.] Pursuant to these findings, ITW argues that early termination of the contract occurred 37 months later in August, 2008, resulting in a maximum early termination penalty of $125,000. [*Id.*] Plaintiff Cameo disagrees and asserts that the start of production was in September 2006 because the agreement considered "start of production" to denote production on the newly installed Cameo paint line or that, in the alternative, "start of production is an ambiguous term". [R 134 at 6-8.]

## C

## 1

ITW believes that Cameo's possible recovery should be solely based upon the Exhibit B penalty which serves as a provision for liquidated damages. [*See* R. 129.] Most relevant is the product supply agreement's section on Termination and Exhibit B itself, which provides a penalty for early termination of the contract. "Section 3: Termination" of the Product Supply Agreement states, in part:

> Earlier termination may only occur upon the following events of default . . .
>
> 3. The other party ceases to do business, makes a composition or assignment for the benefit of its creditors, makes a general arrangement with its creditors concerning any extension or forgiveness of any of its secured debt, becomes bankrupt or insolvent, suffers or seeks the appointment of a receiver to the whole or any material part of its business, takes any action to liquidate or wind up the whole or any material part of its business, is found subject to any provisions of any bankruptcy code concerning involuntary bankruptcy or similar proceeding, or suffers a material adverse change in its financial position such that payments hereunder may be affected or delayed by a creditor or administrator of the business of the other party.
>
> 4. Seller fails to meet the Quality Standards defined by the Boundary Limits agreed between the parties, after notice from Buyer, and after Buyer and Seller have taken all reasonable steps required to resolve the breach, and fails to cure such default within 30 days after written notice of such default is sent to Seller;

[R. 129-4 at 3.] Early termination of the Contract is also addressed in "Exhibit B," the section titled "Penalty for Early Termination of Contract" which provides that, "If ITW Deltar terminates the contract early, for any reason, other than outlined in the exception below, ITW Deltar will pay the following termination penalty…" [R. 129-4.] Following the sliding penalty scale that was fully detailed in the table above, Exhibit B provides an exception to the penalty for early termination of the contract:

***Exception***:    ITW Deltar may terminate the contract due to a serious, continuing Quality or Delivery issue outlined in Section 3.4 of this agreement.  If ITW Deltar IPAC's customer cancels any of the above programs or discontinues purchases from ITW, ITW will not be liable for the Early Termination Penalty.  However, ITW will attempt to mitigate the potential loss of revenue to Prime Finish by actively attempting to source replacement business to Prime Finish.

[R. 129-4 at 4.]  ITW's termination letter cites Section 3.4 as one of the reasons for early termination of the contract, but, ITW admits that "the issue of <u>why</u> ITW terminated the Supply Agreement is a disputed factual matter."  [R. 129-1 at 2.]

Taken together, it is possible that ITW would be permitted to terminate the contract early pursuant to Section 3.1, 3.2, 3.3, or 3.5 of the Product Supply Agreement but still be required to pay the penalty for early termination imposed by Exhibit B so long as the grounds for early termination were not based on Section 3.4 or a customer cancellation.  [*See* R. 129, R. 133 at 6-7.]  Cameo alleges that this is a critical nuance, as it demonstrates that the penalty for early termination in Exhibit B is not a liquidated damages provision— the penalty ranges in exhibit B were not approximations of damages that would result from breach.  [R. 133 at 7.]  Accordingly, Cameo believes that the penalty is not a liquidated damages provision and that the instant action is distinguishable from case law regarding liquidated damages.  *Id.*

In previous filings, counsel for Cameo has referred to the penalty as "liquidated damages."  [R. 133 at 13; *see, e.g.* R. 89 at 6 ("Second . . . Cameo is entitled to recover the penalty for early termination of that Agreement by ITW as liquidated damages." *See also* R. 95 at 2; R. 107 at 2.]  Plaintiff states that their arguments are not inconsistent and judicial estoppel is inappropriate, as "Cameo has made perfectly clear to ITW . . . that it was seeking not only the liquidated amount provided in Exhibit B as an early termination fee, but also its actual and

consequential damages flowing from ITW's breach of the Agreement." [R. 133 at 3.] Defendant asserts that Cameo's arguments are "internally inconsistent and illogical." [R. 137 at 4.]

The jury will ultimately be tasked with determining whether the Plaintiff is entitled to damages. Federal Rule of Civil Procedure 8(d) allows for inconsistent claims and alternative statements of a claim. Fed. R. Civ. P. 8. Generally, judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n. 8 (2000)). In the instant action, the issue of liquidated damages has not yet been litigated and the previous inconsistent positions were not used to the Plaintiff's advantage in any material way. The Defendant's concerns of double recovery will be addressed through the use of jury instructions, *see EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297, 122 S.Ct. 754 (2002) (it "goes without saying that courts can and should preclude double recovery."), but Cameo is entitled to attempt recovery on both compensatory damages for the breach of contract claim and the early termination fee. *See* Fed. R. Civ. P. 8.

**2**

Cameo cites to a number of cases from various state and federal courts that are merely persuasive. [*See* R. 133 at 9-12.] These cases stand for the same general proposition that termination fees, even those based upon predetermined formulas, are not liquidated damages provisions or that when penalties are assessed but not tied to breach, the penalty has been considered compensation rather than liquidated damages. [*See id.* at 10-11 (quoting *Blank v. Bordon*, 524 P.2d 127 (Cal. App. 2015) ("Where a contract for a specified period of time permits a party to terminate the agreement before its expiration in exchange for a lump-sum monetary

payment, the payment is considered merely an alternative to performance, and not a penalty");
*see also St. Jude Med., Inc. v. Medtronic, Inc.*, 536 N.W.2d 24, 28 (Minn. Ct. App. 1995)
(holding that, "implicit" in the three essential elements of a claim for liquidated damages "is the
breach of a contract.")]  ITW notes that none of these cited cases "interprets Kentucky law" and
that "alternative performance provisions are in lieu of, and not in addition to, actual damages."
[R. 137 at 8.]  ITW also presented an aggregate of similar persuasive out-of-state case law that
find termination provisions to be liquidated damage clauses, even when the termination
provisions are not triggered by breach of contract.  [R. 137 at 9 (citing *Hawk's Cay Inv'rs, Ltd. v.
Brandy Marine of the Keys, Inc.*, 524 So. 2d 681, 683-84 (Fla. Dist. Ct. App. 1988) (holding that
when a party terminated the contract early, but did not breach the contract, the contract had a
valid liquidated damages clause that was not an unenforceable penalty.)]  Both parties are
reminded that, while out-of-state case law is occasionally helpful, this court is better served by
briefing that focuses on mandatory authority.

Kentucky Courts have found that "[p]arties may, by contract, liquidate the damages to
which either of them shall be entitled for breach of covenant by the other.  *Taul v. Everet*, 27 Ky.
10, 10 (1830).  A more recent case explains that, "[t]he effect of a clause for stipulated damages
in a contract is to substitute the amount agreed upon as liquidated damages for the actual
damages resulting from breach of the contract…"  *Coca-Cola Bottling Works (Thomas) Inc. v.
Hazard Coca-Cola Bottling Works, Inc.*, 450 S.W.2d 515, 519 (Ky. 1970) (quoting 22 Am. Jur.
2d 321, Damages § 235.)  Further, "[i]f a provision is construed to be one for liquidated damages
. . . recovery must be for that amount. No larger or smaller sum can be awarded even though the
actual loss may be greater or less."  *Id.*

While the Kentucky court's haven't stated as much, Kentucky case law has allowed for "widely varying language [to] constitute valid liquidated damages clauses" and breach might not be an essential triggering event for a valid liquidated damages clause.  [R. 137 at 7 (citing multiple Kentucky Courts of Appeals cases including *Capital Holding v. Octagon Dev. Co.*, 757 S.W.2d 202, 203 (Ky. Ct. App. 1988) (finding a valid liquidated damages clause when a deposit, that was non-refundable if the loan was not closed, was given "in consideration of the expenses which Lender has incurred in considering and approving this proposed investment"); *contra Ramada Dev. Co. v. U. S. Fid. & Guar. Co.*, 626 F.2d 517, n. 11 (6th Cir. 1980) (the Sixth Circuit decided a Michigan case which determined liquidated damages to be "those damages which are reasonably ascertainable **at the time of the breach**, measurable by a fixed or established external standard, or by a standard apparent from the documents upon which plaintiffs base their claim") (emphasis added); *see also G.D. Deal Holdings, Inc. v. Cincinnati Ins. Co.*, No. 1:05CV-3-R, 2007 WL 3306109, at *2 (W.D. Ky. Nov. 6, 2007) (adopting the *Ramada Dev. Co.* definition of liquidated damages and applying that definition to Kentucky law.)]  At issue then, is whether the early termination penalty is a liquidated damages provision. If the penalty is construed as a liquidated damage provision, Kentucky law would enforce the provision and limit the Plaintiff's possible recovery.

"A provision in a contract providing for liquidated damages will be enforced, provided it is in actuality liquidated damages and not a penalty.  If such a provision is in fact a penalty it will not be enforced and the injured party will be entitled to recover the actual damages suffered." *Patel v. Tuttle Properties, LLC*, 392 S.W.3d 384, 387 (Ky. 2013) (quoting *Fidelity & Deposit Co. of Maryland v. Jones*, 256 Ky. 181, 75 S.W.2d 1057, 1060 (1934).  Exhibit B is titled

"Penalty for Early Termination of Contract" and the introductory sentence states that "If ITW

Deltar terminates its contract early . . . ITW Deltar will pay the following termination

penalty. . ." Even so, Cameo purposefully argues that the early termination penalty is not a

liquidated damages provision at all, therefore, it would be improper to categorize the fee as an

invalid liquidated damages provision that is unenforceable as a penalty. [R. 133 at 9.]

ITW asserts that the early termination penalty is a "thoughtful assessment by two

sophisticated business entities, negotiated at arm's length, of what it would take to adequately

compensate Prime if the Agreement was terminated early, based on numerous business

considerations…" [R. 129 at 6.] Kentucky courts favor liquidated damages provisions. *See

Uncle George Orphans Home, Inc. v. Landrum*, 551 S.W.2d 582, 584 (Ky. Ct. App. 1977);

*Coca-Cola Bottling Works (Thomas) Inc. v. Hazard Coca-Cola Bottling Works, Inc.*, 450 S.W.2d

515, 518 (Ky. 1970). ITW cites to *Coca-Cola Bottling Works* to support the proposition that

liquidation damages agreements are enforced and that, when contracts include valid liquidated

damages provisions, these provisions "establis[h] the upper limit of recovery." *Coca-Cola

Bottling Works (Thomas) Inc. v. Hazard Coca-Cola Bottling Works, Inc.*, 450 S.W.2d 515, 519

(Ky. 1970).

In *Coca-Cola Bottling Works*, the Plaintiff bottling corporation in Hazard sued one

defendant for breach of contract and others for conspiring to unlawfully induce the breach. *Id.* at

516. Polly "entered into a purchase agreement with Hazard" and agreed to pay $162,000 for

bottling rights. *Id.* at 517. Polly then delivered a check for $5,000 in escrow "as a guarantee of

the performance of this agreement which shall constitute liquidated damages for any failure to so

perform." *Id.* at 517. The Kentucky Court of Appeals[1] found that this was a liquidated damages provision, noted that the legislature had passed Ky. Rev. Stat. Ann. § 355.2-718 which allows for liquidated damages in contracts, and that "courts favor liquidated damage provisions in contracts." *Id.* at 518 (quoting *Maryland Casualty Co. v. Ballard County*, 217 Ky. 343, 289 S.W. 316 (1926)). Once identified as a liquidated damage provision, the Court found that $5,000 "established the upper limit of recovery" for the breach of contract by Polly. *Coca-Cola Bottling Works (Thomas) Inc. v. Hazard Coca-Cola Bottling Works, Inc.*, 450 S.W.2d 515, 519 (Ky. 1970).

While it is true that Kentucky Courts enforce liquidated damage provisions, those provisions establish upper limits for recovery, and they preclude plaintiffs from securing broader damages, it is not clear whether the Exhibit B "Penalty for Early Termination of Contract" is a liquidated damage provision. As referenced by the Kentucky Court of Appeals in *Coca-Cola Bottling Works*, Ky. Rev. Stat. Ann. § 355.2-718 provides that

> Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

KRS § 355.2-718 (1).

But, this very codification that allows for liquidated damages is qualified by Ky. Rev. Stat. Ann. § 355.2-719 (1)(b) which states, in part, "resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy."[2] The Product

---

[1] The Kentucky Court of Appeals was the highest Court in Kentucky until 1976.
[2] The Sixth Circuit Court of Appeals discussed subsection (1)(b) and stated that "[t]he commentary to this section adds that "[s]ubsection (1)(b) creates a presumption that clauses prescribing remedies are cumulative rather than

Supply Agreement's early termination penalty is distinguishable from the $5,000 that served as a guarantee of performance and "liquidated damages" in *Coca-Cola Bottling Works*. Unlike *Coca-Cola Bottling Works*, in the instant action there are four events of default that would allow ITW to terminate the agreement, without breach, yet ITW would still be required to pay the early termination penalty. [*See* R. 129-4 at 3-4.] Further, the language of Exhibit B forcefully requires payment by ITW Deltar of the "termination penalty" if ITW Deltar chooses to terminate "its contract early, for any reason…" other than the two provided in the exception. [*Id.* at 4.] It does not seem as if the parties expressly agreed that Exhibit B would be the sole and exclusive remedy since it is not necessarily predicated on the contract's breach by ITW. *See* Ky. Rev. Stat. Ann. § 355.2-719 (1)(b).

Cameo argues that "the contract is ambiguous" and that it is uncertain whether the penalty for early termination is intended to be the exclusive remedy for breach. [R. 133 at 14.] In *Uncle George Orphans Home, Inc. v. Landrum*, 551 S.W.2d 582, 584 (Ky. Ct. App. 1977), the court found the contract for sale of realty to be ambiguous as to a liquidated damages provision, therefore the trial court was permitted to consider parol testimony.[3] *Id.* at 584. ITW cited this same case to support the proposition that "plaintiff could only recover $1,000 under the liquidated damages provision of the contract, rather than allowing the plaintiff to prove actual damages." [R. 129 at 8.] *Uncle George Orphans Home, Inc.* suggests that the proper method for

---

exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed." *Island Creek Corp. v. Anker Energy Corp.*, 968 F.2d 1215 (6th Cir. 1992)

[3] The option-contract stated: "If closing does not take place, then buyer's deposit is forfeited." The Kentucky Court of Appeals found this language, in addition to parol evidence, was sufficient to confirm the party's intent to liquidate damages. *Uncle George Orphans Home, Inc. v. Landrum*, 551 S.W.2d 582, 584 (Ky. Ct. App. 1977)

interpreting contract ambiguity can be through consideration of parol evidence at the trial court level.

In *Island Creek Corp. v. Anker Energy Corp.*, 968 F.2d 1215 (6th Cir. 1992), Island Creek agreed to purchase 10,000 tons of coal per week for fifty weeks from Anker Energy. *Id.* at 1215. Article XI in the agreement described a "Performance Bond" which provided for some compensation for Island Creek in the event that Anker Energy failed to deliver 10,000 tons of coal per week.[4] *Id.* Besides this Performance Bond, "[n]o other provision in the Agreement addresses whether, or to what extent, a non-performing party may be liable for damages upon breach. *Id.* The parties then disputed whether the bond was intended to fully compensate the buyer in the event of a breach. Defendants, much like in the instant action, "counter that all parties understood Article XI to be a liquidated-damages provision and that the bond set the upper limit of defendant's liability under the Agreement." *Island Creed Corp.*, 968 F.2d at 1215.

Island Creek attempted to demand full payment on the bond in the amount of $750,000 even though actual losses were more than $1.1 million. Upon review of the Defendant's motion for partial summary judgment the district court granted the motion and "concluded that Article XI of the Agreement constituted a binding liquidated-damages clause limiting Island Creek's recovery. . ." to $229,631.92. *Id.* On appeal, the Sixth Circuit found that "[w]hile it is true, under Kentucky common law, that interpretation of a contract is generally an issue of law . . . the central purpose of contractual interpretation is to identify the parties' intent at the time of the contract formation." *Id.* (referencing *Wilcox v. Wilcox*, 406 S.W.2d 152, 153 (Ky. 1966). But, in

---

[4] The Performance Bond could be drawn upon by Island Creek in dollar amounts per ton of coal that was either not delivered or was rejected due to unsatisfactory quality. Also, Island Creek could draw from the Bond when the seller failed to deliver an "average of 10,000 tons per week for each four week period." *See* Island Creek Corp. v. Anker Energy Corp., 968 F.2d 1215 (6th Cir. 1992).

situations where the contract is ambiguous, "the court must determine the parties' intent from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written." *Island Creek Corp. v. Anker Energy Corp.*, 968 F.2d 1215 (6th Cir. 1992) (quoting *Whitlow v. Whitlow*, 267 S.W.2d 739, 740 (Ky.1954)). In instances where "the contract is open to more than one reasonable interpretation, however, determination of the parties' intent is for the trier of fact." *Id.* (referencing *Cook United v. Waits*, 512 S.W.2d 493, 495 (Ky. 1974)).

Identical to the finding of the Sixth Circuit in *Island Creek*, the text of the Product Services Agreement, including the provisions from Section 3 Termination and Exhibit B's Penalty for Early Termination of Contract, is ambiguous as to whether the parties then contracting intended Exhibit B to be a liquidated damages clause that should serve as the sole remedy for early termination and breach. Much like *Island Creek's* presentation of evidence to the district court, Cameo has provided Testimony of Tim Stout, the former President of Prime Finish, in which he represented that "Prime Finish intended Exhibit B to allow it to repay the investment in the new paint if ITW terminated the contract early."[5] [R. 133 at 16.] The Sixth Circuit also found that there was an "apparent inconsistency between Kentucky statutory and decisional law" because, in *Coca-Cola Bottling Works (Thomas) v. Hazard Coca-Cola Bottling Works*, 450 S.W.2d 515 (Ky. 1970), the court "held that a liquidated-damages clause provided the upper limit of recovery for the non-breaching party absent evidence that the contract contained language to that effect." *Island Creek Corp. v. Anker Energy Corp.*, 968 F.2d 1215,

---

[5] When asked about Exhibit B and the early termination penalty, Mr. Stout said "Well, paying back the investment was really dependent on ITW and what they had told us they would do from a revenue perspective, and if they terminated the contract ahead of schedule the intent was to be able to pay back the investment." [R. 134-1 at 8.]

n. 4 (6th Cir. 1992). The *Coca-Cola Bottling Works (Thomas)* holding contravenes Kentucky law, which requires contractual modification or limitation of remedies to be agreed to by the parties in express terms. *See* Ky. Rev. Stat. Ann. § 355.2-719.

**3**

This testimony presented by Plaintiff suggests that, at the time Prime and ITW made this contract, the provision was not intended to serve as the exclusive remedy for breach. Instead, the provision was the mechanism by which Prime could cover the expense of installing a new paint line that had been funded by Cameo.[6]

The contract, therefore, is ambiguous. After looking to the four corners of the document, it is impossible to determine whether the parties intended for the Penalty for Early Termination to serve as liquidated damages. The contract does not state whether the penalty is the sole and exclusive remedy for all breaches of contract or just for compensation following early termination. *GenCorp, Inc. v. Am. Int't Underwriters*, 178 F.3d 804, 819 (6th Cir. 1999) states that "in the summary judgment context, the mere incantation of 'ambiguity' by the nonmovant does not satisfy its burden under Rule 56. The nonmoving party must present evidence to support a reasonable interpretation that differs from the moving party." *Id.* Also, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Morales v. American Honda Motor Co., Inc.*, 71 F.3d 531, 535 (6th Cir. 1995) (quoting *Liberty Lobby*, 477 U.S. at 255). Here, besides legal arguments and the contract itself, the non-

---

[6] It is appropriate to reference the "Modification Agreement" of November 7, 2005, [R. 129-3] made between Prime Finish, LLC, and Cameo, LLC, whereby Prime agreed that "Any Penalty Payment received by Prime Finish pursuant to Exhibit B of the Production Supply Agreement between Prime Finish and ITW Deltar IPAC dated March 15, 2005 as a result of the failure to place the minimum orders required under Exhibit A of that Agreement shall be paid to Cameo."

movant provided deposition testimony by the President of Prime Finish, the contracting party, which suggests Exhibit B was not an approximation by the parties for damages that would arise from breach.

Both the Sixth Circuit and Kentucky Courts of Appeals agree that contract interpretation is a matter of law to be conducted by the courts. *See Journey Acquisition–II, L.P. v. EQT Prod. Co.*, 830 F.3d 444, 452 (6th Cir. 2016) (finding that "[c]ontract interpretation in Kentucky "is solely a matter of law for the courts"); *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003); *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002) (stating that "the interpretation of a contract, including determining whether a contract is ambiguous, is a question of law for the courts…"). As stated above, this contract is ambiguous because "its language is reasonably susceptible of different constructions." *Journey Acquisition–II, L.P.*, 830 F.3d at 452 (quoting *Blevins v. Riedling*, 289 Ky. 335, 158 S.W.2d 646, 648 (1942)). Courts are allowed to "consider parol and extrinsic evidence involving the circumstances surrounding the execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties" when a contract is "ambiguous or silent on a vital matter." *Cantrell Supply, Inc.*, 94 S.W.3d at 385.

"However, once a court determines that a contract is ambiguous, areas of dispute concerning the extrinsic evidence are factual issues and construction of the contract become subject to resolution by the fact-finder." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002) (referencing *Cook United, Inc. v. Waits, Ky.*, 512 S.W.2d 493, 495 (1974)); *see also Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421–22 (6th Cir. 2008) (finding that "[i]f a contract contains ambiguities, it generally

becomes the task of the fact-finder to use extrinsic evidence to determine the intent of the parties…" and recognizing that "the Fifth Circuit makes clear that when extrinsic evidence creates a genuine issue of material fact as to the parties' intent, the interpretation of the contract becomes a matter of fact appropriately resolved by a jury.")  Therefore, the ambiguity in the Product Supply Agreement, namely whether the parties intended the early termination penalty to serve as liquidated damages, is a factual dispute that requires consideration of extrinsic evidence and must be resolved by the fact-finder.

ITW distinguishes *Island Creek* by recognizing that the language of the performance bond is not identical nor even similar to the penalty for early termination provision.  But, any contract provision will be highly factually dependent.  [*See* R. 137 at 12.]   The Defendant also believes that Cameo has failed to raise sufficient affirmative evidence to create a genuine issue of material fact.  Cameo attempts to use a lack of testimony by Mr. Stouts to support the proposition that the penalty provision was not intended to account for general damages from breach.  [*See* R. 133 at 16 (Mr. Stout "did not testify that the fee was intended by Prime Finish as compensation for *all* damages…")]  Besides that limited and improper use of a witness' deposition, it is true that the Plaintiff's general proposition is supported by Mr. Stout's testimony. Mr. Stout understood the early termination penalty to be limited to compensation that would pay for the new paint line's expense.  [*See* R. 134-1 at 8 (Mr. Stout testified, "If they [ITW] terminated the contract ahead of schedule the intent was to be able to pay back the

investment" made by Cameo.)]  More importantly, the contract itself is unclear as to whether the provision represents liquidated damages and should be the exclusive remedy.[7]

Summary judgment must be denied because there is a genuine issue of material fact.  *See* Fed. R. Civ. P. 56.  The contract is ambiguous and the parties' intent is unclear as to whether Exhibit B's Penalty for Early Termination of Contract was to serve as a liquidated damages provision.  It is possible, from the record, motions, filings, case law, and evidence that "a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  Since there is "affirmative support on both sides" and the question may be "which witness to believe" as to the scope of this agreement, summary judgment is inappropriate.  *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013).  This Court must conclude that, like in *Island Creek*, the Intervenor Plaintiff Cameo has "raised a material issue of fact as to whether the parties, at the time they entered into the Agreement, intended [Exhibit B] to serve as a liquidated-damages provision."  *Island Creek Corp. v. Anker Energy Corp.*, 968 F.2d 1215 (6th Cir. 1992).  Accordingly, the Defendant ITW Deltar IPAC's Motion for Partial Summary Judgment on Cameo's Claim for Actual Damages in Addition to Liquidated Damages [**R. 129**] is **DENIED**.

## D

### 1

Next, Defendant ITW Deltar IPAC moves for Partial Summary Judgment on Calculation of Liquidated Damages.  [R. 130].  ITW refers to the Exhibit B's Penalty for Early Termination

---

[7] *See supra* note 2.

of Contract as liquidated damages. The date of termination is uncontested because Doug

Marciniak, Vice President & General Manager of ITW Deltar Body & Interior sent a letter "Re:

Notice of Termination of Product Supply Agreement" to Mr. Timothy E. Stout, President of

Prime Finish, LLC, on August 1, 2008. [R. 130-6.] In this letter, ITW's representative

terminated the Product Supply Agreement citing events of default under Section 3.3 and 3.4 of

the Product Supply Agreement. [*Id.*] Since Exhibit B establishes penalties for early termination

that decrease over the life of the contract, the date for the "start of production" must be known to

determine the proper penalty. This requires the court to determine "whether the term [start of

production] refers to the start of any production, or whether the term means, as Cameo argues,

the start of production only on the new paint line." [R. 130 at 5.] The issue before the Court

now is a mixed question of law and fact.

## 2

The Product Supply Agreement between ITW Deltar IPAC and Prime Finish, LLC, was

entered into on May 26, 2005. [R. 130-3 at 2.] The agreement has a "term of four (4) years and

shall commence on June 1st, 2005, and shall continue for forty-eight months (48) following the

**start of production** (expected to be January 1, 2006), unless terminated sooner in accordance

with the provisions set forth below." [*Id.*] Prime was hired by ITW to provide painting services

for "four separate vehicle programs: (1) the Camry 044L program; (2) the Tundra & Sequoia

180L program; (3) the Nissan L42A program; and (4) the Honda Pilot program." [R. 130 at 2.]

Mr. Marciniak, Vice President & General Manager of ITW Deltar Body & Interior, asked in a

January 2, 2008, email "I need to know when we received our first production shipment of

Honda Pilot parts from Prime Finish." [R. 130-5 at 3.] In response, Randy Baudry stated "I'm

showing the first receipt on the system as 07-26-05." [*Id.* at 2.] ITW now moves for partial summary judgment on interpretation of the Product Supply Agreement and asks the Court to rule that July 26, 2005, was the "start of production." [*See* R. 130 at 5.]

The parties do not contest the presence of a contract in this case, therefore the Court must interpret the contract and the terms contained within it. *See Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 105 (Ky.2003) ("[T]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court"). First of all, it is important to remember that courts should protect the freedom of individuals to voluntarily enter into contractual agreements with others, and thus should not rewrite a contract for the parties under the guise of construing it. *Bennett v. Dudley*, 391 S.W. 375, 376–77 (Ky.1965); *see also Zeitz v. Foley*, 264 S.W.2d 267, 268 (Ky.1954) ("contracts voluntarily made between competent persons are not to be set aside lightly," for "the right of private contract is no small part of the liberty of the citizen.") Rather, the primary goal of the court should be "to effectuate the intentions of the parties." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S .W.3d 381, 384 (Ky.2002). "Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible." *Id.* at 384–85 (quoting *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky.1986)).

When interpreting a contract, courts must determine which parts, if any, are ambiguous because the presence of ambiguity will direct the analysis. *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105–06 (Ky.2003). If there is no ambiguity, the court must strictly enforce the contract's terms "by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear*, 103 S.W.3d at 106 (citing *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178

(Ky.2000)); *Mounts v. Roberts*, 388 S.W.2d 117, 119 (Ky.1965). When the language of the contract is ambiguous, however, the court must try to determine the intention of the parties by evaluating the contract "as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written." *Frear*, 103 S.W.3d at 106 (quoting *Whitlow v. Whitlow*, 267 S.W.2d 739, 740 (Ky.1954)). Thus, when resolving ambiguous or uncertain contract provisions, the court may use extrinsic evidence concerning the parties' intentions as well as "the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." *Cantrell*, 94 S.W.3d at 385; *Teague v. Reid*, 340 S.W.2d 235, 242 (Ky.1960). A contract or a provision in a contract is ambiguous "if a reasonable person would find it susceptible to different or inconsistent interpretations." *Cantrell*, 94 S.W.3d at 385; *Transport Ins. Co. v. Ford*, 886 S.W.2d 901, 905 (Ky.Ct.App.1994). But, as discussed above, "once a court determines that a contract is ambiguous, areas of dispute concerning the extrinsic evidence are factual issues and construction of the contract become subject to resolution by the fact-finder." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002) (referencing *Cook United, Inc. v. Waits, Ky.*, 512 S.W.2d 493, 495 (1974))

The contract term is four years in length and commences on June 1st, 2005. [R.130-3 at 2.] The contract term also continues for forty-eight months following "the start of production (expected to be January 1, 2006)…" [*Id.*] ITW suggests that the contract is unambiguous and the plain and ordinary meaning of this phrase "start of production" should be used to interpret the term. *See Larkins v. Miller*, 239 S.W.3d 112, 115 (Ky. Ct. App. 2007) (stating that courts should "interpret the terms of [a] contract according to their plain and ordinary meaning"); [R. 130 at 6.]

By applying Webster's Third New International Dictionary (2002) definitions of the words "start of production," a plain and ordinary understanding of this phrase may suggest commencement of the contract term to be triggered when Prime Finish "begin[s] an activity or undertaking" of "the act or process of producing" painted materials for ITW.  [*See Id.*]  But, literal interpretation of the contract term is inadequate and fails to resolve the issue because "a reasonable person would find it susceptible to different or inconsistent interpretations."  *Cantrell*, 94 S.W.3d at 385. Therefore, the term "start of production" is ambiguous and the Court should turn to the document "as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written." *Frear*, 103 S.W.3d at 106 (quoting *Whitlow v. Whitlow*, 267 S.W.2d 739, 740 (Ky.1954))

In Section 1, "Purpose and Intent" of the Product Supply Agreement, the parties make clear that "Seller will be investing in a new paint-line to meet Buyer's requirements" and "Buyer will award the Vehicle Programs specified in Exhibit A . . . that supports Seller's investment." [R. 130-3 at 2.]  These "above interests of Buyer and Seller are material provisions of this Agreement."  *Id.*  In the introductory statements to the contract, the parties recognize that "Seller is a competent painter and decorator of interior automotive products with current capacity to **partially meet the requirements of Buyer**, and desires to paint and decorate interior automotive products supplied by Buyer to Seller."  *Id.* (emphasis added.)  Also, "in order to fully supply Buyer's requirements, Seller will be required to add an additional paint line to its current facility" and "Buyer desires that Seller increases its capacity in order to fully meet Buyer's requirements and is willing to enter into this output agreement in order for Seller to commit to the installation of an additional paint line."  *Id.*  Finally, the introductory statements conclude "in

consideration of the mutual covenants contained herein . . . Seller agrees to invest in a new paint-line in order to meet the capacity required by buyer." *Id.*

The contract itself shows ITW was aware of the paint-line expansion Prime required to meet ITW's full capacity, but also that Prime was already capable of "partially meet[ing] the requirements of [ITW]." [R. 130-3 at 3.] The contract also states that the parties anticipate the start of production to be January 1, 2006. "Exhibit A" sets the "Estimated Minimum Annual Revenue" "which cumulatively provides an estimated minimum Sales revenue to Prime Finish at the following levels in each of the 4 years of the contract." [R. 130-3 at 4.] The "EST. MINIMUM" figures provided are $1.186m for "2006" and $2.885m for 2007, 2008, and 2009. *Id.* It is potentially significant that, while the dollar figures are "EST. MINUMUM" the years are listed, without qualifier, as 2006, 2007, 2008, and 2009. Exhibit A then describes the four programs that are anticipated for the Product Supply Agreement: (1) Camry 044L, (2) Tundra & Sequoia 180L, (3) Nissan L42A, and (4) Honda Pilot. *Id.* at 4.

Plaintiff asks this Court to conclude that the "start of production" cannot be triggered until units are painted using the new paint line funded by Cameo. This request goes too far and must be denied. A finding of this nature would require the Court to rewrite material provisions of the contract for the parties under the guise of construing it. *Bennett v. Dudley*, 391 S.W. 375, 376–77 (Ky.1965); *see also Snowden v. City of Wilmore*, 412 S.W.2d 195, 208 (Ky. Ct. App. 2013) (holding that when "intentions are clearly stated in a written document, we have no authority to add terms not included by the parties.") The contract between Prime Finish and Cameo has no relevance to any "meaning ascribed to 'start of production' under [Prime's] agreement with ITW." [R. 134 at 11.]

Cameo and Prime entered into a separate agreement where Cameo was guaranteed a royalty payment of 7% on all ITW programs, "which were contractually required to run on the new paint line to be installed by Cameo." [R. 134 at 4.] But this contractual obligation existed between Cameo and Prime, not Prime and ITW. ITW was aware that Prime was incurring expense to install an additional paint line, but ITW had no reason to know the details of a financial agreement between Prime and a third party. By supplying Prime with parts to be painted and paying for that service, ITW was fulfilling its contractual duty.

In Cameo's discovery responses, Cameo was asked by ITW to admit that the Honda program "began no later than July 2005." [R. 130-4 at 2.] In response, Cameo objected and stated:

> Without waiving that objection, Cameo admits that the painting of Honda parts by Prime Finish began no later than July 2005. Cameo denies, however, that the painting of these parts was pursuant to the Product Supply Agreement, as the Honda program was not painted on Cameo's paint-line. Furthermore, start of production is defined in Prime Finish's Terms and Conditions (attached to all quotations to ITW) as 'normal production which we define as full release schedule.'

[R. 130-4 at 2-3.]

Cameo also attached a March 13, 2006, email from Tim Stout, President of Prime Finish, which stated "Prime Finish made clear in its correspondence to ITW that it considered 'normal production' as meaning full release schedule," [R. 134 at 14-15] but in this same email Mr. Stout states "**PF made our first full production shipment on 2/20/2006.**" [R. 134-4 (emphasis added).] Cameo also argues that "[l]ow-volume shipments of painted products did not qualify as full production." [*See* R. 134 at 15, *see also* R. 134-5 at 2 (In a September 7, 2006, email Mr. Stout stated that "Thirty (30) days of full production would equate to shipping 93K units. To date, PF has shipped approximately 22K units, far below a full production number."]

Under Kentucky law, courts use the doctrine of contemporaneous construction to interpret clauses of contracts that are subject to more than one interpretation. *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F.2d 118, 120 (6th Cir.1981). According to that doctrine, when determining the meaning of an ambiguous contract provision, "courts are required to give great weight to the interpretation which the parties have placed upon an ambiguous contract. The construction of the parties is best evidenced by their conduct with respect to the agreement." *A.L. Pickens Co., Inc.*, 650 F.2d at 120 (quoting *Billips v. Hughes*, 259 S.W.2d 6, 7 (Ky.1953)). Thus, the Court must examine "the course of performance engaged in by the parties to the contract." *Id.* at 120.

It is critical to note that the Product Supply Agreement [R. 130-3] made between ITW and Prime Finish is a legal document that is separate and distinct from the "Production Service Agreement between Cameo, LLC & Prime Finish." [R. 130-2.] Kentucky case law does instruct Courts, when interpreting contract provisions, to consider "[t]he nature of the contract, its spirit and purpose . . . ." *Lake Bluff Orphanage v. Magill's Ex'rs*, 204 S.W.2d 224, 227 (Ky. 1947). This Product Supply Agreement was not a financing arrangement where ITW was primarily focused on supporting the expansion of a growing paint business. Rather, the Product Supply Agreement was created so that ITW could receive a "dependable and high quality source for the painting and decorating of interior automotive products" from Prime that would "fully supply [ITW's] requirements" under the contract. [R. 130-3 at 2.] The agreement was not formed, as Cameo asserts, "for the express purpose of ensuring that Prime Finish could repay the investment in the new paint line." [R. 134 at 8.] Although, that certainly was a consideration made by ITW

and Prime in agreeing to a multi-year term, early termination penalty, and estimated minimum annual revenue.

Looking to the "course of performance," the Product Supply Agreement was signed May 26, 2005. [R. 130-3.] The start of production might, at the earliest, be triggered two months later when Prime began a July 2005 "last minute takeover project" for the Honda Pilot that was allegedly "not within the scope of the Product Supply Agreement." At the latest, in response to Randy Baudry (ITW), Tim Stout stated that "PF made our first full production shipment on 2/20/2006." [R. 134-4.] Per Cameo's discovery responses, Cameo received $97.72 in royalties in January 2006 for a "fixture cell that provided a secondary painting operation for the Camry 044L program." [R. 130-4 at 3.] Cameo states that this fixture cell was not "contemplated in the Product Supply Agreement" between Prime and ITW. [*Id.*] The discovery response also discloses, with a stated objection, that "start of production of the Toyota Camry automotive program for ITW by Prime Finish began on or after February 1st 2006…" [*Id.* at 5.] Both the Honda Pilot and Toyota Camry 044L program are listed in Exhibit A to the Product Supply Agreement. [R. 130-3 at 4.]

**3**

Interpretation of a contract is a matter of law to be decided by the court. *See Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003). In this contract, the term "start of production" should be understood to mean the start of production by Prime Finish of ITW painted products pursuant to the Product Supply Agreement made between Prime and ITW. [R. 129-4 at 2.] The start date should not be constrained by the additional, non-enumerated, qualifier that production must be on the new cameo line. Interpreting the contract in this manner,

production began before the September 2006 utilization of the Cameo line for ITW projects. [*See* R. 134 at 16.] The Court will grant the Defendant's Motion for Partial Summary Judgment on Calculation of Liquidated Damages, but only in part. Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. By resolving the question of law concerning contract interpretation, it is evident that the "start of production" was, at the latest, in February 2006. [*See* R. 134-4, Tim Stout email to Randy Baudry, Supplier Development Manager for ITW Deltar, stating "PF made our first full production shipment on 2/20/2006."] Summary judgment is granted in part as to the latest possible date that production began.

There are material factual disputes as to whether the "start of production" began in July 2005 or at a later time between January and February of 2006, because "production" is "a term of art in the automotive industry." [R. 134 at 13.] Mr. Stout defined the meaning of "production," in the automotive supply industry, as "producing parts at a level that's consistent with normal . . . volumes." [R. 134 at 13.] Mr. Stout explained that industrial painting jobs for automotive parts undergo a pre-production process known as "PPAP." This pre-production phase would allow for a series of small trial runs in a "multi-month process" that would initially "start with a few parts, get to a couple hundred, and then run a real production trial which is supposed to simulate the volume of a production, a normal production run." [R. 134 at 12-12 (quoting 10-25-16 deposition of Tim Stout); *see also* 12-13-16 Deposition of Patrick Bowden (describing the steps to secure product approval and noting that "Typically this would have all been done before the

start of production. However . . . sometimes it works out that way, and sometimes it does not")
R. 134-1 at 15-16.] Deposition testimony from Nicholas Herbert-Jones, the co-founder of Prime
Finish and Founder of Cameo, suggested that Prime "started trials in January '06" for the Camry
044L program, but he "can't recall when trials finished." [R. 134-1 at 19; *see also* 10-20-16
deposition of Christy Claus (stating that "full production . . . ramp[s] up slowly. They might do
sporadic spot builds of a few hundred parts and then ramp up gradually to that full volume" R.
134-1 at 10.]

ITW argues that "start of production unambiguously means the beginning of Prime's
work under the Supply Agreement." [R. 136 at 9.] But, this statement glosses over the inherent
complexity of when "production" actually begins and whether the pre-production stage is
materially different or should be viewed differently for purposes of tolling a forty-eight month
contract term. Therefore, this factual finding must be left to the jury. *See Cantrell Supply, Inc.
v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002); *Royal Ins. Co. of Am. v.
Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421–22 (6th Cir. 2008). It is unclear from
the record, filings, and submitted documents when the pre-production phase ended and when the
"start of production" commenced. But, more than adequate evidence has been presented such
"that a reasonable jury could return a verdict for the non-moving party" as to the date when
production began. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Accordingly,
Defendant's Motion for Partial Summary Judgment on Calculation of Liquidated Damages
[**R. 130**] is **GRANTED in PART and DENIED in PART**.

## III

Accordingly, for the reasons stated above and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. ITW Deltar IPAC's Motion for Partial Summary Judgment on Cameo's Claim for Actual Damages in Addition to Liquidated Damages [**R. 129**] is **DENIED**; and

2. ITW Deltar IPAC's Motion for Partial Summary Judgment on Calculation of Liquidated Damages [**R. 130**] is **GRANTED in PART and DENIED in PART** consistent with the findings of this opinion.

This the 5th day of May, 2017.

Gregory F. Van Tatenhove
United States District Judge