UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| PRIME FINISH, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil No. 5:08-cv-0438-GFVT |
| and ) | |
| ) | |
| CAMEO, LLC, ) | |
| ) | **MEMORANDUM OPINION** |
| Intervenor Plaintiff, ) | **&** |
| ) | **ORDER** |
| V. ) | |
| ) | |
| ITW DELTAR IPAC, ) | |
| ) | |
| Defendant. ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

"No one will deny that the law should in some way effectively use expert knowledge wherever it will aid in settling disputes. The only question is as to how it can do so best." Learned Hand, *Historical & Practical Considerations Regarding Expert Testimony*, 15 HARV. L. REV. 40, 40 (May 1901). As the above-styled civil jury trial approaches, Defendant seeks to exclude both expert witnesses noticed by the opposite side, alleging the proposed experts are unreliable, their findings lack a sufficient factual basis, and they will not assist the trier of fact. Specifically, the Defendant seeks to exclude both Plaintiff's experts, Mr. Hurley and Mr. Bacon. After reviewing the case law, record, and filings, and for the reasons that follow, the Court finds both experts should be allowed to testify and DENIES the pending motion to exclude.

**I**

This lawsuit was initiated when Prime Finish LLC brought suit against Defendant ITW Deltar IPAC in 2008. [*See* R. 1.] The action was removed by Defendant from Bourbon Circuit

Court. Cameo, LLC, intervened, and following a settlement agreement between Prime and ITW, became the only remaining party with claims against Defendant ITW. The factual predicate behind the instant action is set forth in greater detail in previous orders of the Court, and the most recent ruling on Defendant's Motions for Partial Summary Judgment. [*See* R. 180.] In short, Defendant ITW is accused of breaching a Product Supply Agreement that was made between ITW and Prime Finish. Cameo, as intended creditor beneficiary of the supply agreement, now sues ITW for the contract's early termination penalty and damages arising from ITW's alleged breach. Trial by jury is currently set to begin on May 16, 2017. [R. 120.]

Several months ago the parties exchanged expert reports, prompting admissibility challenges from the Defendant, ITW. Defendant moves to exclude the testimony of Mr. David Bacon and Mr. Paul Hurley pursuant to Federal Rule of Evidence 702 and the legal standard established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). [R. 138.] Neither party requested an oral argument to discuss the expert's qualifications or the data used to formulate the expert reports.

## II

### A

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. From Rule 702 comes a two part test for admitting expert testimony. First, is

the expert qualified and the testimony reliable? And, second, is the evidence relevant and helpful to the trier of fact? *See, e.g.*, *United States v. Jones*, 107 F.3d 1147, 1156 (6th Cir. 1997).

The seminal case applying the first prong of the test is *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). In that decision, the Supreme Court explained that a district court's gatekeeping responsibility is implicit in Rule 702, "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Further, the Supreme Court listed several specific factors to help determine the reliability of expert testimony based on scientific knowledge. *See id.* at 590, n. 8. These factors include whether a theory or technique can be or has been tested; whether the theory has been subjected to peer review and publication; whether there is a high known or potential error rate; whether there are certain operation standards that should have been or were followed; and whether the theory or technique is generally accepted within the scientific community. *Id.* at 592-94. Later, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court determined that the gatekeeping obligation and subsequent factors established in *Daubert* apply with equal force to non-scientific experts. However, those factors are not definitive and district courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho*, 526 U.S. at 152.

As for the second prong of the test, district courts "must ensure that the proposed expert testimony is relevant to the task at hand and will serve to aid the trier of fact." *United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000). The Supreme Court in *Daubert* referred to this prong as the "fit" requirement. *See id.*; *Daubert*, 509 U.S. at 591-93. Because "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes," courts must consider whether a particular expert's testimony will truly assist the trier of fact to

understand the evidence in the case at hand. *Daubert*, 509 U.S. at 591.

Notably, the Court's gatekeeping role under the case law "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999). Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Whether or not to admit expert testimony is a matter over which the district court ultimately enjoys broad discretion. *See, e.g.*, *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672 (6th Cir. 2010).

**B**

Defendant challenges the reliability and helpfulness of the experts noticed by Cameo: Mr. Hurley and Mr. Bacon. For the reasons explained below, both experts will be allowed to testify, as the Court finds the experts' testimony will, indeed, assist the trier of fact.

**1**

Cameo seeks to elicit testimony from Mr. Hurley about "a single narrow issue: how mold defects in injection molded parts provided by ITW impacted Prime Finish's ability to consistently apply a painted finish to those parts."[1] [R. 141 at 7.] Defendant clarifies that Mr. Hurley will not opine as to the "general quality of Prime Finish's painting work, or a statistical analysis of the number of parts rejected due to painting issues." *Id.* After reviewing roughly one-hundred pages of documents, Mr. Hurley's expert testimony will address inconsistencies in the molded product and the resulting defects such as: short shots, gate blush, surface blemish,

---

[1] See R. 138-5 at 4, Paul Hurley's report states, "[i]n Conclusion it is my opinion that there was [sic] ongoing molding issues and the contributing root causes were not fully investigated . . . it is further my opinion that Prime Finish's ability to consistently produce a cosmetic and aesthetic painted part was substantially and continuously hindered."

dented parts, molded in black specks, foreign substance/contamination on raw molded parts, rough surfaces on molded parts, sinks, splay, mold strings, shiny spots, and parting line issues. [*See* R. 138-5 at 2-4.] Mr. Hurley believes the parts supplied by ITW and their mold defects negatively impacted paint quality.

Mr. Dave Bacon, the paint quality expert, has been hired by Cameo to opine as to "whether a serious continuing Quality/Delivery issue existed in the painting work performed by Prime Finish." [R. 141 at 11.] Mr. Bacon's Expert Report concludes in a "Summary" that has four findings: (1) he found no evidence that there was a serious continuing quality or delivery issue, (2) Prime responded to all quality issues in a timely manner, (3) he found no evidence that Prime was notified or evaluated using formal Supplier Quality Procedures, and (4) it is his opinion that "Raw Molded Part Quality" was a factor in Prime's "overall performance." R. 141-5 at 3.]

Defendant ITW has multiple complaints about the experts' proposed testimony but they do not attack either experts' qualifications or expertise. First, Defendant argues that Mr. Hurley and Mr. Bacon's opinions are based on insufficient facts because they failed to consider relevant information and only reviewed information given by Mr. Herbert-Jones (the sole owner of Cameo). [*See* R. 138 at 11-12.] Similarly, Defendant complains that the experts' testimony would be inherently unreliable because Mr. Herbert-Jones provided the experts with "cherry-picked data and information." [R. 138 at 12.] Defendant ITW also believes that the experts failed to consider alternative explanations for quality problems and that this "myopic lens" precluded consideration of painting-related quality issues. [R. 138 at 15.]

**2**

First, will the expert testimony be reliable? In determining whether the proposed

testimony is reliable, the Court must assess the experts' qualifications. Here, however, it does not appear that the either of the Plaintiff experts' qualifications are in dispute. According to Mr. Hurley's deposition, he has worked with injection molding since the 1970s. [R. 141 at 6.] Mr. Hurley worked for many years at a molding and paint finishing company as the Finishing Manager, he started two companies that either provided consulting for the plastics industry or constructed plastics assembly machinery, and more recently he has performed product testing and painting services. [*Id.* 6-7.] Similarly, Mr. Bacon worked in the plastics industry "since the late 1970s." [*Id.* at 10.] He was previously a Director of Quality at Dott Industries, Inc., a plastics painting company, and now he is the General Manager/President of Plasti-Paint, a company where he began working in 1990. *Id.*

The Court "must make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 580 (1993). Part of this preliminary assessment requires the court to consider whether the testimony is based on sufficient facts or data. *See* Fed. R. Evid. 702. ITW believes that both expert opinions lack a sufficient factual basis. ITW suggests that Mr. Hurley only reviewed the documents Mr. Herbert-Jones provided and every document supported Cameo's position "as none referenced Prime's painting defects <u>unless</u> that same document contained apparent evidence of ITW's molding defects." [R. 138 at 11.] Mr. Hurley admits that he did not receive a complete set of analytical data regarding painting defect to molding defect ratios. *Id.* ITW also argues that Mr. Bacon did not receive "comprehensive data on percentage yields" and that his review was limited to six months of Prime's measurement of percentage yields. [*Id.* at 10.]

In determining what information to provide to his expert witnesses, Mr. Herbert-Jones

personally reviewed 24,000 pages of materials in forty binders over four days to identify relevant documents from ITW. [R. 141 at 5.] Documents were categorized based on content, with labels such as "quality" for general quality issues that were further grouped as "PFQ" or "ITWQ" to denote Prime Finish Quality or ITW Quality. Mr. Bacon, who will provide more expansive testimony concerning Prime paint quality, was given 400 pages of materials from all documents that were labeled with both the PFQ and ITWQ tags. [R. 141 at 15.] These documents range in time from August 8, 2005, through August 1, 2008. [*Id.* at 6.] Mr. Hurley was only given one hundred (100) ITWQ documents because the scope of his opinion is "much narrower" than Mr. Bacon's testimony and is limited to ITW mold defects. [R. 141 at 15.] The documents provided to Mr. Hurley range from December 2006 to May 2008. [*Id.* at 10.]

Defendant suggests that, like *Davison v. Cole Sewell Corp.*, 231 F. App'x 444, 449 (6th Cir. 2007), Mr. Hurley and Mr. Bacon's opinions lack a sufficient factual basis such that the Court, in its role as gatekeeper, should sustain this motion and prevent the jury from even considering what weight to give the expert's testimony. [R. 138 at 9.] In *Davison*, the District Court began its opinion by complaining that the record was scarce on facts. *Davison*, 231 F. App'x at 447 (6th Cir. 2007). Richard Silverman, an engineer that was plaintiff's expert witness, prepared an expert report that attributed an accident that injured plaintiff to sixteen possible causes. *Id*. at 448. In this case the Plaintiff was injured by an Ohio Home Depot store display that struck Plaintiff in the head. Mr. Silverman's investigation focused on unreliable and attenuated evidence that was based on a picture of the display from the Ohio Home Depot where the plaintiff was injured, trips made by the expert to a different Home Depot store in Boston, Massachusetts, to view similar displays, testimony by plaintiff's wife that a screw might have been missing, and "internet research about screws." *Davison v. Cole Sewell Corp.*, 231 F. App'x

7

444, 449 (6th Cir. 2007). Mr. Silverman's opinions were appropriately found to be factually and legally insufficient. *Id.*

Unlike the limited and unrepresentative information gathered by Mr. Silverman in *Davison*, in the instant action Plaintiff's experts have been provided with at least one hundred and up to four hundred pages of materials detailing quality issues with ITW's plastic molds and Prime's painted products. Mr. Hurley stated that "[a]ll the defects listed [in his expert report] are what was [sic] in the emails by ITW and Prime Finish," and "I have reviewed so many documents related to molding-related defects that I came to the conclusion that it was impossible for Prime Finish to provide quality product consistently." [R. 141 at 8-9.]

Mr. Bacon's expert opinion is based on a brief provided by Cameo and hundreds of pages of exhibits. Due to volume, only the seven-page spreadsheet that lists the exhibits to be reviewed (including "PAINTING YIELD REPORTS & GRAPHS") and a limited number of documents are included in the record. [R. 141 at 13.] There are chronological gaps in the documents and email correspondence provided to the experts concerning the Product Supply Agreement vehicle programs. [*See* R. 138-1 at 5, n. 1.] But, as explained by Cameo, these gaps logically exist because communications concerning program details and product quality were only exchanged between the parties when vehicle programs were actually being run on the paint line. Since the paint line was not continually running, there are many chronological gaps. [*See* R. 141 at 11.]

The instant action is similar to *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 2007). The expert testimony does not "amount to mere guess or speculation" rather Mr. Hurley and Mr. Bacon's opinions "ha[ve] a reasonable factual basis" and "should not be excluded." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993). In these instances, "it is up to opposing counsel to inquire into the expert's factual basis." *Id.* It is always

8

possible for an expert witness to expend additional resources to form their opinion and draft an expert report. But, eventually, the testimony should be admitted by the court and "any weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than its admissibility." *Id.* Further, as illustrated by *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) (referencing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987).

Defendant alleges that the Plaintiff's expert witnesses are providing unreliable expert opinions because the data they are considering has been cherry-picked. [R. 138 at 12.] As detailed above, Mr. Herbert-Jones attempted to perform a systematic review of 24,000 pages of materials to provide his experts with relevant and useful data. Defendant accuses Mr. Herbert-Jones of only providing Mr. Bacon with data on percentage yields for six months of the three year production period. [R. 138 at 13.] Cameo responds that this assertion "is false" and details the multiple charts of data concerning program yields for January and February 2008, January through December 2007, July through December 2006, and an additional report beginning "11/1/06." [*See* R. 141 at 12.] Similarly, with Mr. Hurley, ITW objects to his opinion because the information he was provided by Mr. Herbert-Jones only relates to production from December 2006 to May 2008. [R. 138 at 13.] It is not the court's role to "supplant the adversary system." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999). The court is unable to ascertain, specifically, how Mr. Hurley's opinion has been formed on a "fundamentally skewed basis," [*see* R. 138 at 13] but, if ITW believes that Mr. Hurley and Mr. Bacon's opinions are so obviously skewed it should undertake "vigorous cross-examination" and "presentation of

9

contrary evidence." *Daubert*, 509 U.S. at 596.

**3**

Continuing with the Court's inquiry into the reliability of Mr. Bacon and Mr. Hurley's testimony, ITW argues that neither expert "considered alternative, painting-related explanations for the quality problems." [R. 138 at 15.] Cameo provided Mr. Bacon with all documents that were classified as responsive to Prime Finish Quality "PFQ" and ITW Quality "ITWQ." [R. 141 at 15.] Mr. Hurley was only provided documents labeled "ITWQ" because Mr. Hurley's testimony is limited to the quality issues with ITW plastic molds and mold defects. *Id.* Defendant ITW contests that, the "reason for this one-sided view [by Plaintiff's Experts] is obvious: they only looked at the information Mr. Herbert-Jones chose to give them." [R. 138 at 15.]

It is true that Mr. Herbert-Jones was the only source to provide documents for Mr. Hurley and Mr. Bacon to review, this is standard practice just as ITW has given documents to its own expert witness, Mr. Lewachirk. While being deposed, Mr. Bacon stated that he had reviewed "correspondence and issues for . . . a mold-related issue, paint related, okay light or blush or runs…" [R. 141 at 18.] Mr. Bacon admitted there were issues with Prime's painting quality at times, that Prime had missed shipment deadlines, and that his review showed the 180L armrest had "a paint-related issue." [*Id.* at 19.] Similarly, Mr. Hurley also considered alternative reasons for problems with quality as he noted there were paint issues but "that a lot of those listed as paint defects were actually underlying mold-related defects." [R. 141 at 20; *see e.g.* R. 141-8 at 9, (Mr. Hurley discussing "warped parts" and stating that "[i]t's possible" when asked if this could have been a "Prime Finish issue"); *id.* (Mr. Hurley testifying that contamination "could be a paint defect or it could be a molded-related defect" and later confirming that "contamination,"

"dry spray," and "scratches" could all have been painter issues.)]

Upon review, the opinions of Mr. Bacon and Mr. Hurley are sufficiently reliable. As the experts conducted their analysis of the documents that were provided to them, they underwent a logical process that considered alternative explanations, admitted fault with some of ITW's painted products, but both experts ultimately concluded that mold defects were a substantial factor that significantly affected paint quality. Defendant's recourse is to present contrary evidence as to these conclusions and conduct cross examination in a manner that leads jurors to question the weight that should be given Mr. Bacon and Mr. Hurley's opinions. *See* Fed. R. Evid. 611(b) (explaining that matters of a witness's credibility may be addressed through cross-examination); *see also Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (finding that an expert testifying as to causation need not eliminate all other possible causes and "[t]he fact that several possible causes might remain 'uneliminated' ... only goes to the accuracy of the conclusion, not to the soundness of the methodology.")

### C

Next, if reliable, is the testimony helpful or relevant? To be relevant, the testimony must help the jury understand the evidence or determine a fact at issue. *Daubert*, 509 U.S. at 591; *United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000) (district courts "must ensure that the proposed expert testimony is relevant to the task at hand and will serve to aid the trier of fact.") The Supreme Court in *Daubert* referred to this prong as the "fit" requirement. *See Smithers*, 212 F.3d at 313; *Daubert*, 509 U.S. at 591-93. Apart from Defendant's initial argument, ITW maintains that Mr. Hurley and Mr. Bacon's opinions are inadmissible, pursuant to Rule 702, because "it will be unhelpful for the jury to hear an expert summarize a limited subset of available evidence . . . the jury is fully capable of reviewing and understanding." [R. 138-1 at

11

15-16.] With these assertions, ITW grossly mischaracterizes the expert's analysis, going so far as to suggest that Mr. Hurley's "simplistic approach[]" and "methodology consists of creating a summary of bullet notes that highlights specific issues." [R. 138 at 16.] Even the most cursory review of the record shows that the Defendant's characterization of the Mr. Hurley's methodology is highly inaccurate.[2]

It is clear from the briefing, depositions in the record, and submitted evidence, that the fact-finder must determine whether breach of the Product Supply Agreement occurred. This finding will undoubtedly require expert testimony as to the quality of the painted products, plastic molds, and the impact of defects on this highly technical process. The Product Supply Agreement allows for early termination of the agreement if "Seller [Prime] fails to meet the Quality Standard defined by the Boundary Limits agreed between the parties" but neither "quality standard" nor "boundary limits" are defined. [*R*. 130-3 at 3.] The Exhibit B "Penalty for Early Termination of Contract" allows for ITW to escape payment of the penalty if there is a "serious, continuing quality or Delivery issue." [*Id.* at 4.] These terms were "subjective," "ever-changing," and require the fact-finder to answer "complex and highly technical" questions. [R. 141 at 22.]

As experts, Mr. Hurley and Mr. Bacon will shed valuable light on this complicated industrial plastic painting process that is certainly unfamiliar to the average juror or layperson.[3]

---

[2] The deposition testimony clearly demonstrates that Mr. Hurley's methodology does not culminate in a list of simplistic bullet points. *See* R. 141-8 at 5 ("Q: What was your purpose in preparing these summary notes? A. The way I review documents is I review them several times. I do research. I do evaluation. I do analysis, and then I create a summary of bullet notes that highlights specific issues that needed to be addressed or related [sic] my final report."

[3] Mr. Hurley and Mr. Bacon have prepared reports that address multiple complex and technical issues. Defendant can present contrary evidence and cross examine these witnesses. It is difficult for this Court to believe that jurors of ordinary experience and knowledge would have understanding of or familiarity with industrial plastic painting terms or concepts such as: Q1

Consequently, this testimony is relevant, and helpful to the trier of fact. Under Rule 702, *Daubert*, and subsequent case law, "rejection of expert testimony is the exception, rather than the rule." Fed. R. Evid. 702, advisory committee's note, 2000 amend.; *see also In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 530 (6th Cir. 2008). The Plaintiff's experts are qualified, the testimony is sufficiently reliable, and the evidence is relevant and helpful to the trier of fact. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *United States v. Jones*, 107 F.3d 1147, 1156 (6th Cir. 1997); Fed. R. Evid. 702.

### III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** that the Defendant's Motion to Exclude Mr. Bacon and Mr. Hurley Under Federal Rule of Evidence 702 [**R. 138**] is **DENIED**.

This the 5th day of May, 2017.

Gregory F. Van Tatenhove
United States District Judge

---

targets, acceptable yields, acceptable fallouts, the efficacy of visual inspections, the degree of gloss of paint, how the flame process reduces blush, gate blush, warp parts, hairline flash, sink, warped parts, off-color bronze, or surface blemish. *See* R. 141 at 21-22.